IN THE UNITED STATES BANKRUPTCY COURT FOR THE
WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| BRIAN DOUGLAS BRAY and | ) | Case No. 04-20121 |
| DIANNA KAY BRAY, | ) | |
| | ) | |
| Debtors. | ) | |
| | ) | |
| BRIAN DOUGLAS BRAY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. No. 04-2014 |
| | ) | |
| EDUCATIONAL CREDIT | ) | |
| MANAGEMENT CORP., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

The subject of this adversary proceeding is a complaint filed by Debtor Brian Douglas Bray ("Debtor") seeking a determination that his student loan debt should be discharged pursuant to 11 U.S.C. § 523(a)(8) on the ground that repayment of that debt would impose upon him an undue hardship. The Court has jurisdiction over the claim asserted in the complaint pursuant to 28 U.S.C. §§ 1334(b), 157(a) and (b). This is a core proceeding which the Court may hear and determine pursuant to 28 U.S.C. § 157(b)(2)(I). The following constitutes my Findings of Fact and Conclusions of Law in accordance with Rule 52 of the Federal Rules of Civil Procedure made applicable to this proceeding by Rule 7052 of the Federal Rules of Bankruptcy Procedure. For the reasons set forth below, I find that Debtor's student loan debt is dischargeable pursuant to § 523(a)(8) as repayment of the debt would impose upon him an undue hardship.

## I.  FACTUAL BACKGROUND

Debtor, who is now 41 years old, is a 1988 graduate of Kansas Weslyan College with a joint degree in psychology and religion.  From the period 1989 through 1998, during which he also worked full time, Debtor worked toward and eventually obtained a Masters Degree in Educational Psychology from Kansas State University.  During that period, Debtor took out a number of student loans, two of which he continues to pay and as to which he has not sought discharge.  The remaining loan, now held by defendant Educational Credit Management Corporation ("ECMC" or "Defendant") had a balance as of June 13, 2005 of $125,011.28 with interest accruing thereafter at the rate of $24.91 per day.  Defendant's Exhibit 1.  After graduation, Debtor applied for a number of jobs in his field.  Debtor utilized various resources to seek employment opportunities including the career center at Kansas State University and numerous websites.  Debtor testified to having applied to no less than 104 schools for positions in his field during the period from 1998 to 2000.  He obtained three interviews, but no job offer.

In 1990, while Debtor was working toward his graduate degree, he met and married the co-debtor in the underlying Chapter 7 proceeding, Dianna Kay Bray.  At the time, she was working on a masters degree as well.  In 1995, a daughter, Jordan, was born to the couple. Dianna graduated in 1998 and was offered employment as a science teacher in Versailles, MO, where the family moved.  Debtor was hired as a library assistant in Versailles where he worked for approximately one and one-half years.  Sometime in the year 2000, Debtor obtained a job with the Missouri River Regional Library in Jefferson City, where he still works.  He commuted between Versailles and Jefferson City for three years.  Unfortunately, sometime at the end of 2002 or early 2003, the couple developed marital difficulties and separated.  Debtor moved to

Jefferson City and obtained an apartment.

Debtor and Dianna filed a joint Chapter 7 proceeding in this Court on January 20, 2004. They were separated, but not yet divorced at the time of filing. While he had an apartment, Debtor also spent time at the home of his new girlfriend, his current wife, Kelly. A discharge was entered in the Chapter 7 proceeding on April 27, 2004.

On April 14, 2004, Debtor initiated this adversary proceeding and obtained a default judgment on June 4, 2004. That judgment was ultimately set aside upon the motion of Defendant ECMC as a result of the Court's conclusion that the complaint had not been properly served.

In the meantime, Debtor and Dianna obtained a divorce in July 2004. Pursuant to the terms of the dissolution, Dianna has custody of the couple's daughter, Jordan. Debtor was ordered to pay $252.00 per month in child support and has visitation rights under which Jordan visits him every other weekend, alternate holidays and six weeks during the summer. Debtor is obligated to pay one-half of her medical and other educational expenses, including the costs of college education. Debtor testified that his ex-wife has indicated her intention to modify the visitation arrangements, although no proceeding is yet pending. Debtor has hired counsel to defend him in that proceeding, although he has yet to pay counsel a retainer.

On August 14, 2004, Debtor remarried. His current spouse, Kelly, has three children, John age 16, Kelsey age 19 and Lindsey age 22. Lindsey has a child of her own, Catlin, who is approximately two years old. At the time of the trial, Kelsey was also expecting a child. All of these children live with Debtor and Kelly in the home Kelly owns.

Debtor still works at the library in Jefferson City earning a gross monthly income of

$1,710.80 with net earnings of $1,390.85. Plaintiff's Ex. 1. Debtor also testified that he has tried several times to secure a higher paying position, but without success. His new wife, Kelly, works at Capitol Regional Medical Center. Her monthly take home pay is approximately $667.00 per month. Plaintiff's Ex. 1. She currently works part time, but prior to January 2005, had been employed in a full-time capacity. John receives Social Security income of $655 per month which will terminate when he turns 18, approximately one year from now. Kelsey was working part-time at Target, but based on doctor's orders, ceased that employment. After the birth of her child, she intends to go back to work. At the time she ceased working, she was working part-time and making approximately $250 per month. Plaintiff's Ex. 1. A full-time equivalent would be approximately $545.00 per month. Plaintiff's Post-Trial Brief, p. 4. Finally, Lindsey also works at Capitol Regional Medical Center and has a monthly take home pay of approximately $1,100.00. Plaintiff's Ex. 1.

## II. DISCUSSION

### A. Applicable Legal Principles on Determination of Undue Hardship

Debtor contends that it would be an undue hardship for him to repay the remaining amount due on his student loan. Under § 523(a)(8), certain student loans are nondischargeable unless repayment of the loan would impose an undue hardship on the debtor or his dependents. The burden of establishing undue hardship, by a preponderance of the evidence, is on the debtor. *Ford v. Student Loan Guarantee Found. of Arkansas (In re Ford)*, 269 B.R. 673, 675 (B.A.P. 8th Cir. 2001); *Andrews v. South Dakota Student Loan Assistance Corp. (In re Andrews)*, 661 F.2d 702, 704 (8th Cir. 1981). Unfortunately, the Code contains no definition of the phrase "undue hardship" and interpretation of the concept has been left to the courts. In this Circuit, the

applicable standard is the "totality of the circumstances" test. *See Long v. Educ. Credit Mgmt. Corp. (In re Long)*, 322 F.3d 549, 554 (8th Cir. 2003); *Andrews*, 661 F.2d at 704; *Fahrer v. Sallie Mae Servicing Corp. (In re Fahrer)*, 308 B.R. 27, 32 (Bankr. W.D. Mo. 2004). In applying this approach, the courts are to consider: (1) the debtor's past, current and reasonably reliable future financial resources; (2) the reasonable necessary living expenses of the debtor and the debtor's dependents; and (3) other relevant facts and circumstances unique to the particular case. *Long*, 322 F.3d at 544; *Ford*, 269 B.R. at 676. The principal inquiry is to determine whether "the debtor's reasonable future financial resources will sufficiently cover payment of the student loan debt – while still allowing for a minimal standard of living"; if so, the indebtedness should not be discharged. *Long*, 322 F.3d at 554. The Court must determine "whether there would be anything left from the debtor's estimated future income to enable the debtor to make some payment on her student loan without reducing what the debtor and her dependents need to maintain a minimal standard of living." *In re Andresen,* 232 B.R. 127, 139 (B.A.P. 8th Cir. 1999); *accord Long*, 322 F.3d at 554-55.

There is no precise formula for or statutory definition of what constitutes a "minimal standard of living." On one end of the spectrum, it is clearly not enough for the Debtor simply to demonstrate that payment of the student loan would require a readjustment of his financial situation or a diminution in his lifestyle. *Educ. Credit Mgmt. Corp. v. Stanley (In re Stanley)*, 300 B.R. 813, 817 (N.D. Fla. 2003). Debtor is therefore not entitled to maintain the standard of living he enjoyed before the filing of the petition. *See Stanley*, 300 B.R. at 817. On the other hand, it is not necessary that a debtor live in abject poverty in order to demonstrate undue hardship and obtain a discharge of student loans. *See Stanley*, 300 B.R. at 818. In this case,

Defendant argues that repayment of the student loan cannot be an undue hardship because Debtor's household income exceeds the poverty standards.  This Court has previously held that the fact that a Debtor's income is in excess of poverty guidelines does not mean that, by definition, repayment of the loan cannot constitute an undue hardship.  *Fahrer*, 308 B.R. at 33-34; *see also In re Meling*, 263 B.R. 275, 280 (Bankr. N.D. Iowa 2001) (debtor's income just above poverty guidelines, but other factors considered lead to discharge of student loan debt)*; In re Powers*, 235 B.R. 894, 900 (Bankr. W.D. Mo. 1999) (listing poverty guidelines as one factor to consider; not controlling).  A minimal standard of living requires that the debtor have sufficient financial resources to satisfy needs for food, shelter, clothing and medical treatment.  *Gill v. Nellnet Loan Services, Inc. (In re Gill)*, 326 B.R. 611, 627 (Bankr. E.D. Va. 2005); *see also Myers v. Fifth Third Bank (In re Myers)*, 280 B.R. 416, 421-422 (Bankr. S.D. Ohio 2002) (minimal standard of living includes the following elements: shelter, utilities, food and personal hygiene, clothing, health insurance or ability to pay medical and dental expenses and recreation).

The "totality of the circumstances" is obviously a very broad test, giving the Court considerable flexibility.  As a result, courts in the Eighth Circuit have looked to a number of facts and circumstances to assisting them in making this determination including: (1) total present and future incapacity to pay debts for reasons not within the control of the debtor; (2) whether the debtor has made a good faith effort to negotiate a deferment or forbearance of payment; (3) whether the hardship will be long-term; (4) whether the debtor has made payments on the student loan; (5) whether there is permanent or long-term disability of the debtor; (6) the ability of the debtor to obtain gainful employment in the area of the study; (7) whether the debtor has made a good faith effort to maximize income and minimize expenses; (8) whether the

dominant purpose of the bankruptcy petition was to discharge the student loan; and (9) the ratio of student loan debt to total indebtedness. *VerMaas v. Student Loans of North Dakota (In re VerMaas)*, 302 B.R. 650, 656-57 (Bankr. D. Neb. 2003); *Morris v. Univ. of Arkansas*, 277 B.R. 910, 914 (Bankr. W.D. Ark. 2002). Applying the totality of the circumstances test to the instant case, the Court examines each factor separately.

### B. Analysis of the Totality of the Circumstances

#### 1. Past, Present and Reasonably Reliable Future Financial Resources

The first factor that the Court must consider is Debtor's past, present and reasonably reliable future financial resources. The Court must first consider whose income, in addition to the Debtor's, should be included in this first stage of the analysis. It seems clear that the income of the Debtor's spouse, at least in a situation in which the income is pooled and the expenses are drawn from that pooled income (as is the case here) is appropriate. In fact, the vast majority of the courts have so held. *See Sweeney v. Educ. Credit Mgmt. Corp. (In re Sweeney)*, 304 B.R. 360, 362-63 (D. Neb. 2002) ("Overwhelming authority requires that a court consider the spouse's income. This Court finds no published opinion of a court that holds to the contrary."); *Educ. Credit Mgmt. Corp. v. Buchanan (In re Buchanan)*, 276 B.R. 744, 751 (N.D. W. Va. 2002); *White v. U.S. Dept. of Educ. (In re White)*, 243 B.R. 498, 509 (N.D. Ala. 1999).

While it seems clear that the Court should consider Kelly's income, the parties take competing positions with respect to what that should be for purposes of this analysis. As noted, her current income, on a part-time basis is $667.00 per month. Kelly voluntarily reduced her status to part time in January 2005. There is conflicting testimony as to the reason for her decision – whether it was to return to school or to provide childcare for Lindsey's daughter – but

the Court considers the controversy irrelevant to its decision. Defendant argues that full-time income should be imputed to Kelly and, for several reasons, this Court agrees. Kelly testified that she reduced her hours to part time in anticipation of returning to school. However, the evidence indicates that she has made no specific plans and has not been admitted to any particular school. Accordingly, whether she will in fact return to school on a full-time basis is speculative. Second, even if she does so, this Court considers it inappropriate for her to voluntarily reduce her hours, and thus the household's income, at the same time the Debtor is requesting discharge of his student loan on undue hardship grounds. *Cf. Smith v. Educ. Credit Mgmt. Corp. (In re Smith)*, 328 B.R. 605, 612 (1st Cir. B.A.P. 2005) (small adjustment in work hours of debtor could yield income increase); *Rose v. United States Department of Education (In re Rose)*, 227 B.R. 518, 525 (W.D. Mo. 1998), aff'd 187 F.3d 926 (8th Cir.1999) (debtor cannot choose to take a low paying job and thereby create undue hardship). Finally, since the Court must look not only at the static financial situation existing at the time of trial, but anticipate reasonable future income as well, even if this Court assumes that Kelly will continue reduced income for some time while completing her education, she would be capable of, and apparently intends to re-enter the workforce on a full-time basis thereafter in the same field. At that point, she would certainly make at least the same full-time income she previously enjoyed or, perhaps with enhanced educational credentials, more than that. For these reasons, the Court will use a monthly income figure for Kelly of $1,100.00, her imputed full-time income.

As mentioned above, John draws a monthly Social Security payment of $655.00, and will for approximately one more year. At present, that resource is also available to the family. The parties seem to be in agreement that Lindsey's monthly net income is approximately $1,100.00.

Kelsey's imputed full-time income before she terminated her employment during her pregnancy was approximately $545.00 per month. The evidence is that Kelsey should be able to and intends to return to the work force after the birth of her child. If the Court considers only the income of the Debtor and his spouse (the latter imputed on a full-time basis), the household's monthly net income is $2,490.55. Adding the Social Security payment, which will enhance the household's income for approximately another year, the total income is $3,145.85. If the Court also includes the income of Kelly's two daughters at the levels suggested above, the total monthly household net income is $4,790.85.[1] For the reasons cited below, the Court believes that the household's reasonably reliable future income is, however, less than this.

## 2. Reasonably Necessary Living Expenses

The second factor the Court must review is Debtor's reasonable living expenses. Since the date of the filing, Debtor's household situation has changed and his monthly living expenses have been in flux. Three sets of schedules of income and expenses were prepared and introduced into evidence, reflecting the household's income and expense situations at different points in time and predicated upon different assumptions. The first set of schedules was filed at the time Debtor was still married to Dianna, but maintaining a separate household. Defendant's Ex. 6. Debtor listed expenses of $1,772.00 which represented the expenses attributable to himself and to his daughter Jordan for those periods of time during which she was in his household. Co-

---

[1] Debtor received a tax refund in the amount of $2,316.00 for the tax year 2004. Defendant suggests that the Court should add the sum of $193.00 per month to the household's disposable income as a result. While the Debtor received such a refund of the 2004 tax year, it is unclear whether he expects to or will receive a similar tax refund for the tax year 2005. There is no evidence to indicate that the Debtor or Kelly are significantly underwithheld. Moreover, since the Debtor's household situation is in flux, it would be inappropriate for this Court to conclude that the Debtor's exemptions and deductions will be of a similar nature for the foreseeable future. The Court simply thinks it inappropriate to project this number into the future and consider it a stable component of the household's income and a long-term source of repayment of the student loan debt.

-9-

debtor Dianna filed a Schedule J showing separate expenses of $1,550.12. An amended set of schedules was prepared to reflect the situation that existed after the Debtor and Kelly had joined households, but before they were married, and before Lindsey and her daughter rejoined the household. Defendant's Ex. 7. That schedule showed expenses of $3,712.00 for maintaining a household which consisted of the Debtor, his daughter Jordan (in the household pursuant to the same visitation arrangement), Kelly, her son John and her daughter Kelsey. The final set of schedules showed expenses of $4,200.59 reflecting a household consisting of the Debtor, his daughter Jordan (again, under the same visitation arrangement), new spouse Kelly, her son John, her two daughters, plus her granddaughter. Defendant's Ex. 12; Plaintiff's Ex. 1.

The immediate question that arises is which expenses the Court should consider in determining whether the household has disposable income with which to make payments on Debtor's student loan. The investigation the Court is commanded to make by the statute is whether repayment of the student loan would constitute an undue hardship on "the Debtor and his dependents." Consequently, expenses for the maintenance and support of persons other than the Debtor's dependents should not be deducted when determining what income is available to the Debtor to make payments on the student loan and therefore in determining whether repayment of the loan would constitute an undue hardship. Most courts that have considered the question have concluded that the expenses attributable to the support of emancipated adult children should not be considered in conducting the undue hardship analysis. *Gill*, 326 B.R. at 631-634; *see also e.g., Perkins v. Pennsylvania Higher Educ. Assistance Agency (In re Perkins)*, 318 B.R. 300, 306 (Bankr. M.D.N.C. 2004); *Buchanan*, 276 B.R. at 752; *Williams v. Educ. Credit Mgmt. Corp. (In re Williams)*, 301 B.R. 62, 73 (Bankr. N.D. Cal. 2003); *Archibald v.*

-10-

*United Student Aid Fund (In re Archibald)*, 280 B.R. 222 (Bankr. S.D. Ind. 2002); *Coveney v. Costep Servicing Agent (In re Coveney)*, 192 B.R. 140 (Bankr. W.D. Tex. 1996); *Stebbins-Hopf v. Texas Guaranty Student Loan Corp. (In re Stebbins-Hopf)*, 176 B.R. 784 (Bankr. W.D. Tex. 1994); *Conner v. Illinois State Scholarship Comm'n (In re Conner)*, 89 B.R. 744 (Bankr. N.D. Ill. 1988). There is additional justification for excluding the expenses in this case in that the children in question are not Debtor's natural children and he has not adopted them. Accordingly, the Debtor has neither a familial nor a legal relationship or obligation to support them. *See Educ. Credit Mgmt. Corp. v. Gouge (In re Gouge)*, 320 B.R. 582, 586 (W.D.N.C. 2005) (disallowed expenses of supporting two emancipated step-children). Finally, Debtor's wife testified that her anticipation is that Lindsey and her child and Kelsey and her child will be out of the household within one to three years. It is apparent given the size of the debt, that it can be repaid, if at all, only over an extended period of time. Moreover, this Court is directed to consider not only the Debtor's current expenses, but also his reasonably anticipated future expenses. Since these expenses, attributable to Lindsey, Kelsey and their children, will not be incurred for an additional extended period of time, the Court will not consider them in conducting the undue hardship analysis.

Defendant contends that there is no competent evidence with which to determine which of the household's expenses are attributable to Debtor's non-dependents and that Debtor therefore has failed to meet his burden of proof in establishing undue hardship based on the income and expense situation for him and his legal dependents. The Court disagrees. It is possible, considering the evidence of the expenses of the different household configurations and examining the increases in certain categories to approximate the incremental cost of having an

additional child in the household. With that information, it is possible to make a reasonable judgment as to the expenses the household would have if those children, who are not the Debtor's dependents, were no longer in the household.

The appropriate household, for the purpose of considering this analysis, would be the Debtor, his daughter Jordan, his wife, and her son John. Debtor's original schedules show expenses of $1,772.00, attributable to him and his daughter. In comparing this with the first set of amended schedules and examining the increases in expenses in basic categories likely to fluctuate with household size, it is possible to make a determination of the extent to which the expenses increase as a result of the presence of those additional people in the household. The first set of amended schedules includes three additional people – Kelly, her son and her daughter. The aggregate increases in the categories of food, medical care, insurance, water, miscellaneous, laundry, transportation and personal care items is $1,077.00, or approximately $359.00 for each of these three additional individuals.[2] A similar comparison between the second set of amended schedules and the first set of amended schedules yields a similar result. In that scenario, the household increases from four persons plus Jordan to six persons plus Jordan, an increase of two individuals, those two individuals being Lindsey and her daughter. The aggregate increase in

---

[2]The categories and their increases are identified below:

| | | |
|---|---|---|
| Food | $200.00 | $700.00 |
| Medical | $ 30.00 | $200.00 |
| Auto Insurance | $ 40.00 | $172.00 |
| Water | $ 30.00 | $ 50.00 |
| Miscellaneous | $600.00 | $700.00 |
| Laundry | $ 50.00 | $ 75.00 |
| Transportation | $100.00 | $160.00 |
| Personal | $ 30.00 | $100.00 |

Auto insurance expense actually increased from $40.00 to $400.00, but in a subsequent set of schedules, declined to $172.00. The Court uses the latter figure here. The aggregate amount of the increase is $1,077.00.

expenditures in identified categories likely to fluctuate with differences in size of the household is $727.00 or $363.50 per individual.[3] Using this information, it is possible to approximate what the household's expenses would be if the household consisted of three persons (Debtor, his wife and her son) plus Jordan. Using the figure of approximately $360.00 per person, the aggregate reduction in the last set of scheduled expenses would be $1,080.00. Subtracting that figure from the scheduled amount of $4,200.59 yields household expenses of $3,120.59.[4]

After exclusion of expenses attributable to household members who are not the Debtor's dependents, the remaining expenses fall into the categories of things necessary for maintenance of a minimal standard of living. There is nothing in the Debtor's expenses that smacks of extravagance. As a matter of fact, Defendant did not really identify any particular category of expenses as being either unnecessary or unreasonable.

---

[3]The categories and their increases are identified below:

| | | |
|---|---|---|
| Electricity/Heating | $142.00 | $224.00 |
| Water/Sewer | $ 50.00 | $ 70.00 |
| Telephone | $100.00 | $200.00 |
| Food | $700.00 | $800.00 |
| Laundry | $ 10.00 | $ 80.00 |
| Medical | $200.00 | $425.00 |
| Transportation | $160.00 | $240.00 |
| Recreation | $ 50.00 | $100.00 |

While Debtor and his spouse both insisted that the utilities are now closer to $400.00 with all these individuals in the household, the Court did not find the evidence supporting this contention to be credible and therefore uses the $224.00 figure from Debtor's exhibit. The aggregate amount of the increase is $727.00.

[4]Debtor's spouse testified as to what she felt the expenses of the household would be if Lindsey and her daughter and Kelsey were no longer part of the household. As recapitulated in the Debtor's post-trial brief, the result of making those manipulations to the household expenses results in an expense figure of $3,105.59. While the Court had questions about the reliability of this testimony, the result does tend to confirm the Court's analysis based on the various versions of scheduled expenses introduced into evidence. In addition, it is reasonably consistent with the Debtor's original schedules which showed combined expenses of $3,322.12. While these expenses involve some duplication because separate households were being maintained, they would also underestimate to some extent the actual expenses brought into the Debtor's household as a result of his marriage to Kelly, because of various debts of her own which she is repaying to certain creditors on a monthly basis and which are reflected in the household's expenses. These items approximately offset each other. Moreover, John was not included in these figures.

If the Court excludes those expenses attributable to household members who are not dependents of the Debtor, it must, in order to be consistent, and for many of the same reasons, likewise, exclude their income. Since the Court must take not a snapshot of the Debtor's financial condition, but must look to the reasonably anticipated future income of the household, the Court must acknowledge that the income Kelsey and Lindsey are bringing into the household is a short-term item and not a source of funds for long-term debt repayment. Excluding their income, the household income would at present be $3,145.85, approximately $25.24 more than the household's expenses. This calculation, however, includes the $655.00 per month John is receiving from the Social Security Administration, a payment which will be terminated in approximately one year. Deducting that sum from the household's income leaves it with $2,490.85, considerably less than the household's likely expenses. The household, therefore, lacks income with which to make a payment on the Debtor's student loan.

The Court reaches this conclusion without even taking into consideration a number of categories of expenses which Debtor and his spouse contend must be incurred in the not to distant future. They both testified that they had been advised that they need to replace the pipes in the house at a cost of $3,000.00 and that occasional basement flooding could be remedied by an expenditure of $2,000.00 in repairs to the home's foundation. The Court, however, does not include these figures because no evidence was offered as to the precise nature of the problems, or the consequences of failing to repair them. For this reason, the Court lacks any basis with which to find that these expenditures are imminently necessary.

In a somewhat different category are the expenses Debtor testified he has been advised to incur for dental work. The Debtor testified that he suffered a gum infection, which although

treated with antibiotics, is likely to reoccur. If it does, he was told that it might affect his heart with potentially serious consequences. The Debtor was advised that he should have his teeth replaced at a total cost of $6,000.00, $4,000.00 of which he would have to incur out of his own pocket. Those expenses would be reasonably necessary. *See Williams*, 301 B.R. at 72. In addition, because both Debtor and Kelly work, they will likely require two vehicles. Their current vehicles include a 1995 Geo Prism with approximately 198,000 miles on it which will need to be replaced before long, with a resultant monthly expenditure. *See Pollard v. Superior Comty. Credit Union (In re Pollard)*, 306 B.R. 637, 647 (Bankr.D.Mn. 2004).

### 3. Other Relevant Facts and Unique Circumstances

The Court must also consider any other unique facts or circumstances relevant to the question of whether repayment of the student loan would cause the Debtor undue hardship. Debtor testified as to numerous medical conditions from which he suffers, including diabetes, a heart defect, kidney stones, an ulcer and diverticulitis. The Court has concluded, however, that this impressive litany of medical problems does not impair to any significant extent Debtor's earning capacity and income. These conditions appear to be controlled by medication and the expenses of his medical care and prescriptions are either covered by insurance or reflected in the expenses the Court has considered in making the undue hardship analysis. Finally, according to his own testimony, while Debtor missed numerous days of work in both 2004 and 2005, all of those absences were within his employer's policy of allowances for medical absences and have not adversely affected his income.

On cross-examination, Debtor admitted that he had been made aware of a repayment option under which he could repay the loan at approximately $200 per month. While no

evidence was introduced of specific terms and conditions of this program, it appears from Debtor's other testimony that both Defendant's counsel and the Debtor were referring to the Income Contingent Repayment Plan ("ICRP") available as part of the William D. Ford program. Debtor contends that this Court should not consider the ICRP option as it is obliged to determine whether the *debt* can be repaid, not some portion of it. In addition, the Debtor maintains that this program is not a viable option for him, suggesting that only a portion of this debt will be paid over the 25-year period that the Debtor would be in the program, and that he would suffer enormous tax liabilities upon forgiveness of the balance of the indebtedness at its conclusion.

The Court disagrees with the Debtor on both counts, concluding both that it must consider the availability of repayment options and also that the potential tax implications are too speculative for this Court to consider. The Courts in this district and elsewhere in this circuit have held that in determining whether the debtor is capable of repaying a student loan without undue hardship, it is appropriate to consider any restructuring options available to the debtor. *Pollard*, 306 B.R. 653; *Rose*, 227 B.R. at 525-526 (bankruptcy court had to consider debtor's ability to repay, not just over original term of loan, but over 25-year term available under refinancing option). The Court must therefore consider the fact that a refinancing option is available to the Debtor pursuant to which he could pay as little as $200.00 per month in repayment of the loan. The Court finds Debtor's argument about forgiveness of indebtedness income speculative for several reasons. First, pursuant to 26 U.S.C.§ 108(a)(1)(B), Debtor would only incur discharge of indebtedness income to the extent that the discharge renders him solvent, a result which is, at this point, impossible to predict. In addition, offers in compromise options are available to the Debtor and the IRS has the authority to forgive tax indebtedness if it

doubts its collectibility. *See Rose*, 277 B.R. at 525-526; *see also Stanley*, 300 B.R. at 818 n. 8 ("But it seems a stretch to assert that payment of student loans for 25 years under a federally approved program would create such a tax liability, even under today's tax laws. Forecasting such a tax liability under whatever tax laws will be in effect in 25 years would be shear speculation. Forecasting the effect any such liability would have on Ms. Stanley's actual standard of living at that time would be even more speculative."); *Archibald*, 280 B.R. at 228.

However, while the Court agrees with Defendant that the Court should consider the availability of the ICRP and not discount it because of speculative, potential, future tax liabilities, the Court must consider the effect of the Plaintiff's participation in the program. *See Fahrer*, 308 B.R. at 35. According to the testimony, Debtor's initial required monthly payment would be $200. There is no testimony or other evidence to permit the Court to determine what the subsequent monthly payments might be or how they would be determined. As indicated above, this Court has already concluded that the Debtor lacks a sufficient surplus of monthly income over expenses to make such a payment. Accordingly, the ICRP is not a viable option for this Debtor and its existence does not alter this Court's conclusion that repayment of the indebtedness would constitute an undue hardship on the Debtor and his dependents.

Many of the other factors the courts have identified as relevant in determining the existence of undue hardship are either inapplicable here or the Court gives them little weight. While the Debtor has made few payments on his substantial student loan, he testified that he did contact the lender with regard to deferments and forbearances. The Court is convinced that the Debtor made every effort to find a position related to his degree, but had no success. In addition, the Debtor testified that he has made efforts to find higher paying positions, in order to maximize

his income, but without success. While a substantial percentage of the indebtedness listed on Schedule F which the Debtor seeks to discharge is related to his several student loans, substantial medical and credit card debts are also listed.[5]

For all the above reasons, the Court finds that repayment of Debtor's student loan indebtedness to Defendant would impose an undue hardship on the Debtor and his dependents and it is therefore dischargeable pursuant to 11 U.S.C. § 523(a)(8).

A separate Order will be entered in accordance with Bankruptcy Rule 9021.


Dated:    October 14, 2005                /s/ Dennis R. Dow
                                          THE HONORABLE DENNIS R. DOW
                                          UNITED STATES BANKRUPTCY JUDGE

Copies to:
John Reed
Larry Bork

---

[5] According to Defendant's Ex. 6, Debtor's Schedule F shows total unsecured liabilities of $205,597.10, approximately $166,000 of which consists of student loan debt.